TRICE, administratrix, vs. ROSE.

1. Before an objection to testimony can be considered, it must appear that the objection was made in the court below, and also what the ground of objection was.

2. The charge of the court not being sent up in the record, nor excepted to save in one particular, it will be presumed in all other particulars to have been legal and to have fully covered the questions in the case.

3. Questions of good faith and fraud are peculiarly within the province of the jury. They are made, by law, the sole judges of such questions; and after two or more concurrent verdicts in a case

turning upon such questions, the evidence will be taken most strongly in favor of the prevailing party.

4. If one purchase before a judgment against his vendor has been obtained, if the purchase be *bona fide* and for value, and the purchaser continue in open and notorious possession of the land for four years after judgment is obtained, during which time no attempt is made by the judgment creditor to enforce execution against the land, such purchaser will be protected, under §3583 of the code, although he took no deed at the time of the purchase, nor had obtained a deed up to the time of the levy of the execution.

(*a*) The protection afforded by the section of the code cited does not depend upon the purchaser's having a paper title, but upon the *bona fides* of the purchase, the payment of a valuable consideration, and possession for four years after judgment.

5. It not appearing that the question of estoppel was made in the court below, it will not be considered here.

July 11, 1888.

Practice. Charge of court. Verdict. Judgment. *Bona fide* purchaser. Estoppel. Before Judge JENKINS. Baldwin superior court. July term, 1887.

Reported in the decision.

C. P. CRAWFORD and D. B. SANFORD, for plaintiff in error.

WHITFIELD & ALLEN by J. H. LUMPKIN, and JOS. H. HALL, *contra.*

SIMMONS, Justice.

It appears that at the February term, 1875, of Baldwin superior court, Lucinda A. Trice, executrix of E. Trice, deceased, obtained a judgment against Nathan McGehee for the sum of $877.20, principal, with interest and costs. Execution was issued on this judgment in April, 1875, and this execution was levied upon 269 acres of land as the property of Nathan McGehee, in March, 1885. In April, 1885, H. M. Rose filed a claim to said land. At the same term of the court, he filed a bill in equity in aid of his

claim case; wherein he alleges that on the 20th of August, 1872, he became security for Nathan McGehee on a promissory note given by said McGehee to Sibley & Son, for $2,507.11, and in order to protect him from any loss he might sustain by reason of his suretyship for said McGehee, McGehee made and executed to him a mortgage upon the land levied upon. He further alleges that when said note became due, McGehee was unable to pay it, and that he, as security, was compelled to pay off said note in January, 1873; that McGehee, being insolvent and having nothing but the land on which he had given the mortgage to Rose, sold and conveyed said land to Rose, in January, 1873, at and for the price of $2,507.11, which was a full and fair price for the land, and that at that time he finally and fully discharged the said McGehee from all liability to him on account of the money paid on said note; that at the time of the purchase he took no deed or written evidence of title to the land, because he thought the mortgage was sufficient title thereto, but that he went immediately into possession of said land, and remained in possession, exercising acts of ownership and control over the same from 1873 up to the present time; that about that time, he was advised by a competent and skilful attorney that, in order to protect and perfect his title to the land, it would be necessary for him to foreclose the mortgage on the same, and acting upon this advice he employed said attorney, and at the February term, 1873, obtained a rule *nisi* to foreclose said mortgage, and the rule was made absolute at the August term, 1873, and execution was issued thereon; that he afterwards used the execution with various creditors as collateral security, transferring the execution to said creditors; that whenever he did so use it, he always informed said creditors of his ownership and possession of said land. He further alleges, that if the judgment of Trice was ever a lien upon this land, the land was discharged from said lien, because he was a *bona fide* purchaser of said property, and had been in possession for

ten years before the levy was made.    He asked a decree perpetually enjoining said *fi. fa.* from proceeding against said land, and in case the court would not grant him that relief, he asked a decree against Nathan McGehee for the sum of $2,500 with interest, and that this decree might be a superior lien to Trice's judgment.    The answer of Mrs. Trice simply denied all the material allegations in the bill.

It appears from the record that this mortgage execution of Rose was lost at one time, and that Rose petitioned the court for an *alias fi. fa.*, stating in said petition that McGehee had never paid any part of said debt.    Rose testified on the trial of the case that McGehee was his half-brother, and that he had stood his security on a promissory note for $2,500, in 1872, which his brother was unable to pay when the same fell due, and that he (Rose) took up the note, substituting his own note and a mortgage on his own land in place of the note on which he was security, and that McGehee, in order to reimburse him, sold him this land and put him in possession; that he went into possession of it in January or February, 1873; that his possession was open and notorious, and remained so up to the time of the trial; that shortly after he purchased the land from his brother, his brother removed from the place to his mother's house, where Rose himself lived, he and McGehee being sons of the same mother; that McGehee was old and feeble at the time, and went to his mother's in order to be taken care of and because he had no other relatives in that county to whose house he could go; that he foreclosed the mortgage against his brother after the sale of the land to him by his brother, because he was advised by Mr. Briscoe at the time that that was the way to protect his title; that he did not think a deed was necessary after the foreclosure; that he deposited the mortgage execution with two creditors at different times as collateral security for loans made to him, and at each time and on all occasions he asserted his ownership of the land to the

creditors with whom he had deposited the execution; that he had received from the place on an average about seven bales of cotton a year; that he had paid the taxes on the place ever since he purchased it, although it appeared from the tax books as having been returned by McGehee as agent; that he had told the tax receiver to continue it on his books that way. The tax receiver testified the same thing, as to Rose giving in the taxes in that manner. Rose testified that the value of the land at the time he purchased it was about $8 an acre. Other witnesses testified as to the value of the land, holding it at from $3 to $8 an acre, except one, who placed it at $8 an acre. It appeared also, on this point, that Lawton had lent $1,400 of money to Rose, taking this land as security, and that Rose was to lend one-third in amount of the value of the land. Several witnesses testified that Rose had been in open and notorious possession of the land for fifteen years. Perry testified that he had advanced money to Rose, and had taken this mortgage *fi. fa.* as part collateral for the advance, and that Rose had told him at that time that the land belonged to his brother. Whitfield, who was Perry's attorney in preparing the papers for that loan, testified that Rose stated at that time that the land belonged to him and not to his brother. One witness testified that he heard McGehee say, some time subsequent to the alleged sale of land, that the land belonged to him and not to Rose, that Rose only had it for the purpose of working out the debt which he (McGehee) owed to Rose, and that the debt would soon be paid, and he would go back in possession. Another witness testified that he heard the contract between Rose and McGehee about the sale of the land, and that Rose was complaining that the land was not sufficient to pay him the $2,500 which he had assumed for McGehee, and McGehee told him it was all he had, that he would try to make up the balance. It appears further, from the evidence, that Rose never paid Sibley the $2,500, although he had given his note and mortgage for the

amount, and that in 1876 they reduced it and compromised the matter by taking Rose's note for fifteen bales of cotton, and Wright as security on said note. This note was subsequently paid off by Rose. When Rose was negotiating with Lawton for the loan, in 1883, Lawton's attorney declined to recommend the loan, because Rose had no paper title to the land. A deed was prepared that was carried to McGehee by Payne; and McGehee stated that the land belonged to Rose, that he had sold Rose the land in consideration of his taking up the Sibley note, and that he would have made him a deed long ago if he had thought it would have been necessary. In 1882, McGehee applied to the judge of the superior court for the appointment of a trustee, alleging in his petition that the trustee appointed for him under his grandmother's will was dead, and that it was necessary for him to have a trustee in order for him to dispose of this land, which he alleged in his petition belonged to him. It appears that Rose never saw this petition or knew anything about it until it had been acted upon by the court.

This, in substance, is the testimony which was before the jury upon the trial in the court below. The jury found the property not subject. Mrs. Trice made a motion for a new trial, which was overruled by the court, and she excepted. The grounds of the motion for a new trial are as follows: (1) that the court erred in admitting claimant to testify to an oral contract between himself and the defendant in *fi. fa.*, who is now dead, said contract being the chief issue on trial; (2) said verdict is contrary to law and the evidence and the charge of the court; (3) the court erred in charging §3583 of the code as applicable to the evidence.

1. The first ground of this motion cannot be considered here, because the motion does not state that objection was made to this testimony in the court below, nor does it state the grounds of the objection.

2. The main question in this case was as to the *bona*

*fides* of Rose; as to whether that was a real *bona fide* purchase that he made from McGehee, or whether it was fraudulent. The charge of the court below was not sent up in the record, nor is there any exception taken thereto, except the 3d ground. We therefore presume that the charge was a fair and legal charge, that the court called the attention of the jury to all the *indicia* of fraud and the acts of good faith as disclosed by the evidence; he doubtless called their attention to the fact that Rose took no deed at the time of the purchase; to the fact that he foreclosed this mortgage in a month after he claimed to have purchased the land; to the fact that Rose placed the mortgage *fi. fa.* as collateral for two loans that he claimed from Wright and Perry & Denton; to the fact that he applied for an *alias fi. fa.*, and the recitals in that application; to his declarations to Perry; the declarations of McGehee wherein he claimed the land belonged to him; the application of McGehee for a trustee; and upon the other hand, to Rose's explanation of his conduct, the sufficiency of that explanation to satisfy the jury, his possession, his ownership and the *bona fides* of the whole transaction.

3. After this legal charge, the jury found for the third time in favor of Rose. It was a question of good faith and of fraud. These questions are peculiarly within the province of the jury. The jury are made by law the sole judges of these questions. They are to determine from the evidence whether the transaction was *bona fide* or fraudulent. As said before, they have found three times that Rose purchased this land from McGehee in good faith. It was held by this court at the present term, that " after two or more concurrent verdicts, the evidence is to be taken by a reviewing court most strongly in favor of the prevailing party." In that case, there had been three verdicts in favor of Windsor, upon conflicting testimony. The judge below set aside the third verdict as he had the other two verdicts, and this court reversed his judgment and said that the third verdict should stand. *Windsor vs. Cruise,* 79 *Ga.* 635.

While we might not have found this verdict if we had been the jury, yet the tribunal appointed by law to ascertain the facts and motives having found three times that this was a fair transaction between Rose and McGehee, we do not feel disposed on this ground to set aside that verdict, especially as the able, conscientious and impartial judge who tried the case is satisfied with the verdict.

4. Complaint is made in the third ground that the judge charged section 3583 of the code, it being claimed by the plaintiff in error that it was inapplicable to the facts as disclosed by the evidence. We do not think that it was. The gist of that section of the code is *bona fides*. The same questions we have just considered are embraced in that section. Was Rose a *bona fide* purchaser of this land? If so, was he in possession of it more than four years after the rendition of Trice's judgment? If he was, we are at a loss to see how the section was inapplicable to the case. It does not matter, in our opinion, whether the judgment had been obtained when Rose purchased or not. If he purchased *bona fide* and paid value, and took no deed at the time of the purchase, he had a perfect equity to have forced McGehee to make a deed; and if Mrs. Trice allowed her execution to remain in the hands of the sheriff for four years after she obtained it, and Rose continued in open and notorious possession of the land, we do not see why this section of the code would not apply to that state of facts. On a careful reading of this section, it will be seen that it does not depend upon the purchaser's having a paper title. It depends upon the *bona fides* of the purchase, the payment of a valuable consideration, and a possession of four years. If these three things concur, the statute declares that the lien of the judgment shall be discharged from that particular land. We are strengthened in this view by the decision in the case of *Janes, adm'r, vs. Patterson*, 62 *Ga.* 527, in which this court held, that " where the vendee of land, holding a bond thereto with part of purchase money paid, sold and conveyed the same

by deed, and the vendor, before the sale, obtained judgment for the balance of the purchase money unpaid and levied the execution thereon; and a purchaser deriving title from the purchaser from the vendee claimed the same, and relied upon the four years' statute to discharge the land from the lien of the judgment for the purchase money, he and those under whom he held having had possession for more than four years before any legal levy was made: *held*, that if the purchase was *bona fide* and for value, the land was protected against the lien of the judgment, but only to the extent of the interest in the land which the defendant in execution had under the bond for titles, the four years' possession not beginning to run so as to discharge the entire title in the land from the lien for purchase money until that title passed by deed out of the defendant in execution." In that case the vendor sold the land to the vendee in 1854, the vendee paying part of the purchase money. The vendee subsequently sold the land. The vendor sued the vendee for the balance of the purchase money in 1858. The purchaser from the vendee had been in possession more than four years when the execution for the purchase money was levied, and this court held that the lien of the judgment was discharged as to that part of the land which had been paid for, although no deed was made until just before the levy.

We therefore think that when Mrs. Trice, as executrix of her husband's estate, allowed her judgment to remain in the sheriff's hands, and never levied it upon this land until four years after she had obtained a judgment, and Rose became a *bona fide* purchaser for value, the lien of the judgment was discharged as to this land, whether Rose had a paper title or not; and the court below did not err in giving this principle in charge to the jury.

5. It was argued before us that Rose was estopped from claiming title to this land, by his action in foreclosing the mortgage and applying for an *alias fi. fa.* and that therefore the verdict was wrong. If that theory be sound, it

ought to have been presented in the court below. "The estoppel, if any, ought to have been urged there, but neither in the motion for a new trial nor elsewhere in the record is there any indication that the question of estoppel was presented to the court or to the jury; and for that reason, we do not deal with it here." *Jones vs. Grantham*, March term, 1888, (*post.*)

Judgment affirmed.